Eastern District of Kentucky
FILED
SEP 26 2005
AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON

CIVIL ACTION NO. 04-442-KSF

RONALD T. RICHARDSON                                              PLAINTIFF

V.                          **OPINION & ORDER**

PRUDENTIAL INSURANCE COMPANY
OF AMERICA                                                        DEFENDANT

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court on Plaintiff Ronald T. Richardson's motion for judgment [DE #10]. Having been fully briefed, this matter is ripe for review.

I.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The Plaintiff, Ronald T. Richardson ("Plaintiff" or "Richardson"), presents claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiff is a 28-year employee of the Trane Company ("Trane"). He is eligible to receive benefits under Trane's long-term disability plan (the "Plan") through an insurance policy issued by Defendant, Prudential Insurance Company of America ("Defendant" or "Prudential").

Richardson was last employed by Trane as a maintenance team leader. The job description describes this position as "[p]rovid[ing] direction and leadership to maintenance department's skilled craftsmen in the areas of supporting and maintaining building, production operations, machines and systems." (AR 187). Trane classifies the position as a "desk job". (AR 181).

Richardson has a history of heart disease. He has undergone angioplasty, heart catherization and the placement of stents in his arteries. (AR 152-56 & 189). He also suffers from rheumatoid arthritis. (AR 127).

In November 2002, Richardson was driving home from work when he suffered a tightening in the chest that radiated up his neck. (AR 189). He became dizzy and then took a sublingual nitroglycerin tablet. He eventually lost consciousness and ran his vehicle off the road. (AR 166). Plaintiff was later taken to Pattie A. Clay Hospital in Richmond, Kentucky. (AR 166).

Over the next few months, Richardson continued to suffer recurrent episodes of chest pain and frequent lightheadedness. (AR 150, 153). In January 2003, Richardson visited Peter L. Gallagher, M.D., with Lexington Cardiology Consultants. Dr. Gallagher advised Richardson that he should stop operating a motor vehicle. (AR 189). Dr. Gallagher ordered a tilt-table test, which was performed on February 3, 2003. The test conclusions were "dramatically positive" and confirmed Dr. Gallagher's diagnosis of neurocardiogenic syncope. (AR 150-51). This condition is associated with a sudden drop in blood pressure followed by a temporary loss of consciousness and posture. (AR 189). On January 20, 2003, Richardson ceased working because of Dr. Gallagher's recommendation that he avoid stress and strenuous activity. (AR 11).

Since Richardson continued to have chest pain, Dr. Gallagher ordered another cardiac catherization (AR 150-51). The cardiac catherization was performed on February 18, 2003. On March 11, 2003, Richardson again saw Dr. Gallagher. Dr. Gallagher concluded, "He has no further episodes of syncope and has done well since treatment. At this time I think it would be reasonable for the patient to be able to drive since he has had no further syncopal spells with treatment." (AR 146).

2

On May 27, 2003, Richardson's primary care physician, Jerry Brackett, M.D., signed a Prudential Attending Physician Statement. (AR 177-78). Dr. Brackett's Statement repeatedly states that Richardson is "totally and permanently disabled". On June 9, 2003, Dr. Gallahger submitted a Prudential Attending Physician Statement. (AR 179-80). Dr. Gallagher's Statement states that Richardson is "unable to work at 100%". Under section 8 of the Statement, entitled "Return to Work Plan", Dr. Gallagher states that the work duties Richardson can perform are: ⊘. Dr. Gallagher left blank the remainder of the questions in the return to work plan section. In his brief, Richardson concludes that Dr. Gallagher's notation of ⊘ represents that Richardson can perform zero work duties. Prudential concludes that Dr. Gallagher's notation of ⊘ represents that the question is "not applicable".[1]

Richardson again suffered syncopal episodes in May 2003 and July 2003. During this time it is unclear if he was under the care of a physician. In August of 2003, Richardson began visiting the Veterans Administration Hospital (the "VA Hospital"). On August 2, 2003, Humaira Hassan, M.D., Staff Physician at the VA Hospital, recommended that Richardson cease driving. (AR 68).

In June of 2003, Richardson filed his claim for LTD benefits with Prudential. (AR 183-84). On September 3, 2003, Prudential notified Richardson that it was denying his claim. On September 4, 2003, Prudential sent Richardson a letter of denial. (AR 45-47). The letter states:

> Based on our review of the medical records [on] file from Dr. Gallagher and Dr. Breckett [sic] there does not appear to be sufficient evidence supporting that an impairment exists that would preclude you from performing your occupation. Dr. Gallagher documented as of your last office visit with him that you were able to resume driving and other normal activities.

---

[1] In response to at least one other question on the Statement, Dr. Gallagher responded, "N/A", the common notation for "not applicable." (AR 179).

3

(AR 46). It appears that when Prudential denied Richardson's benefits, it had not received a copy of Richardson's VA Hospital records. (AR 63).

Richardson immediately requested Prudential to reconsider its decision. Richardson submitted a favorable determination letter as to his SSDI benefits from the SSA. (AR 117-18). Prudential denied this first request for review by letter dated November 3, 2003. (AR 38). In January 2004, Richardson submitted a second appeal of Prudential's denial of his claim for LTD benefits and tendered additional medical documentation, including his file from the VA Hospital (AR 63 and 116).

The VA Hospital file provides a record of his May 2003 and July 2003 syncope episodes. (AR 66, 69). It also contains an initial recommendation for Richardson not to drive. (AR 68). One of the VA Hospital records, dated December 5, 2004, states that Richardson:

> continues to have spells - when fatigued / following activity when feels lightheaded / like is going to pass out. States starts with pain in chest which goes to neck, has trouble breathing, then gets fuzzy headed and feels faint but does not go completely out (aware of surroundings). States these episodes vary in frequency from 0 -> 3 / day. States on average has 3-4 / week. Relieved with rest.

(AR 84). This record also states that Richardson started on the drug Midodrine around October 2003. (AR 84). Midodrine can have a beneficial effect on symptom frequency for patients with neurocardiogenic syncope. (AR 16). On January 23, 2004, whiled taking Midodrine, Richardson had another syncope episode. A VA Hospital record dated February 4, 2004, states that Richardson "had a syncopy spell January 23rd after a ballgame that he became upset with. Incontinent of bowels and bladder. Vomited several times. Aware of surroundings when this was happening." (AR 91). After this episode, VA Hospital doctors again directed Richardson to

4

refrain from driving. (AR 94).

As part of this final determination, Joyce Bachman, M.D., Prudential Medical Director, reviewed Richardson's medical records. As part of her SOAP Note[2], Dr. Bachman noted that Richardson fractured his ankle while "putting up hay" on June 3, 2003. Richardson, however, did not fracture his ankle during this time. Prudential admits that it inadvertently included the medical records of Ronald S. Richardson, another Trane employee, in Plaintiff's file. Ronald S. Richardson, not Plaintiff, received a broken ankle in June 2003. Dr. Bachman concludes:

> In my opinion [Richardson] was not stable in March when he had improvement of his symptoms because he was seen by a physician 11 days later with history of another syncopal episode. There are no office visits for April or May of 2003 in regards to his neurocardiogenic syncope and he could have RTW in a sedentary job during that time confirmed by the fact that on 6/3 he was "putting up hay" when he fractured his ankle.

(AR 17). Thus, Dr. Bachman's conclusion that Richardson could have returned to work was partially based on the medical records of Ronald S. Richardson's ankle fracture.

On May 18, 2004, Tamika Artis, Claim Manager, recommended overturning Prudential's second decision. Artis concluded, "The medical evidence in file documents evidence of an unstable cardiac condition (episodes occurring at least every 3-4 mths). . . . Due to the frequency of [employee's] episodes and [attending physician] noting [employee] unable to drive alone, it is evident [employee] has not [been] stabilized. . ." (AR 18). On May 20, 2004, Michelle Pence, Claim Manager, reviewed Artis's decision. (AR 19). Pence, however, concluded that the decision should be overturned only through October of 2003. Pence noted that in October of

---

[2] "SOAP Note" refers to "Subjective Objective Assessment and Plan notes", which are often used by physicians and medical personnel. Prudential uses SOAP Notes for any documentation made by one of its employees in a claim file.

5

2003, the claimant's physician noted that Richardson could drive as long as another individual was in the car since he has presyncope symptoms and knows when an attack is coming. She concluded that since there was no problem with him driving, there should be no concern with desk work. Pence also noted that Richardson began Midodrine and reported some improvement in symptoms. Finally, since Richardson remained without an episode from July 2003 to January 2004, Pence concluded that there was no evidence of a continuous disability which would prevent sedentary work. (AR 19).

## II. STANDARD OF REVIEW

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the United States Supreme Court held "that a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." When the benefit plan gives the plan administrator discretion, the decision is to be reviewed under an arbitrary and capricious standard. *Id.*

The Plan undisputedly grants the claims administrator sole authority and discretion to resolve all disputes regarding the interpretation of the Plan, including making any findings of fact necessary for determination of any benefit payable under the Plan. As Group Policy #99494 provides: "'Total Disability' exists when Prudential determines that all of these conditions are met. . . ." (AR 37).

The United States Court of Appeals for the Sixth Circuit has determined that "the arbitrary and capricious standard is the least demanding form of judicial review of administrative action." *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). Under the

arbitrary and capricious standard, a plan administrator's decision must be upheld if it is "rational in light of the plan's provisions." *Id.* (citing *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988)). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id.*

## III.    MOTION FOR JUDGMENT

To determine whether the Plan administrator's decision to deny long-term disability benefits to Richardson was rational in light of the Plan's provisions, it is necessary for the Court to look at the specific provisions at issue in the Plan. "Total and permanent disability" exists under the Plan when Prudential determines that all of these conditions are met:

> (1)   Due to sickness or accidental injury, both of these are true:
>
> > (a)   You are not able to perform, for wage or profits, the material and substantial duties of your occupation.
> >
> > (B)   After the Initial Duration of a period of Total Disability, you are not able to perform, for wage or profit, the material and substantial duties of any job for which you are reasonably fitted by your education, training, or experience. The initial duration if equal to the first 24 month of Inbenefit.
>
> (2)   You are not working at any job for wage or profit.
>
> (3)   You are under the regular care of a Doctor.

The Plan administrator's decision can only be considered arbitrary and capricious if it is not rational in light of these provisions.

### A.    Plaintiff's Arguments

Plaintiff argues that Prudential's decision to deny his claim was arbitrary and capricious because it was based upon the medical records of a third-person – Ronald S. Richardson.

7

Richardson asserts that both Dr. Bachman and Pence relied on the fact that since he was able to "put up hay", then his medical condition did not significantly affect his lifestyle and he was not totally and permanently disabled.

Richardson claims that Prudential further ignored the opinions of Dr. Gallagher and Dr. Brackett, who both concluded that he could not work in any occupation. Furthermore, Plaintiff contends that Prudential failed to realistically portray his job. Although Prudential found that Richardson's job was sedentary, Richardson states that there are physical requirements to his position and there is a great deal of stress associated with managing 15 - 18 skilled maintenance persons. Finally, Plaintiff asserts that by reviewing his file while concluding he held a sedentary position, Prudential restricted itself to deciding whether Plaintiff could sit at a desk rather than whether he could perform the essential duties of his own occupation.

### B. Defendant's Arguments

Prudential first argues that no place in the Administrative Record lists that "strenuous activities, stressful situation and sudden movements of any kind" could trigger a syncope episode, other than Richardson's own statements to Prudential. Thus, there is no evidence that Richardson's job causes these syncope episodes.

Prudential next states that the medical records of Ronald S. Richardson were immaterial to each of the decisions that Prudential made. The initial determination and first appeal decision made no mention of the broken ankle. Prudential asserts, that "it is clear that the final decision by Prudential to award disability through October 31, 2003, but deny continuing long-term disability benefits, was based solely on the conclusion that Midodrine was working and that Mr. Richardson could return to work as a result." (Prudential's Response, p.16).

8

Prudential also contends that it is not required to accord any special deference to the opinions of either Dr. Brackett or Dr. Gallagher or to the SSA decision. Prudential asserts that it relied on the letters of Dr. Gallagher, the long-term treatment plan proscribed by Dr. Gallagher, and the opinion of Dr. Bachman, all of which form a reasonable basis for the decision granting Plaintiff benefits only through October of 2003.

Finally, Prudential concludes that Richardson's presyncope episodes had dropped dramatically and he only had three or four episodes of actual syncope where he completely passed out. Such a condition does not make him totally disabled.

## IV.   ANALYSIS

As an initial matter, Prudential asserts that it relied on the letters of Dr. Gallagher, the long-term treatment plan proscribed by Dr. Gallagher, and the opinion of Dr. Bachman in its conclusion to deny Richardson benefits. Prudential chose to completely disregard the opinion of Dr. Brackett. Generally, a plan administrator's choice to rely upon the medical opinion of one doctor over that of another is not arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision. *McDonald v. Western-Southern Life Insurance Co.*, 347 F.3d 161, 169 (6th Cir. 2003); *see also Abnathya v. Hoffmann-LaRoche, Inc.*, 2 F.3d 40 (3d Cir. 1993); *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375 (7th Cir. 1994); *Birdsell v. United Parcel Serv. of Am.*, 94 F.3d 1130 (8th Cir. 1996). However, that medical opinion must still provide a sufficient basis for concluding a participant is or is not disabled.

In determining whether Dr. Gallagher's and Dr. Bachman's opinions provide a sufficient basis for concluding Richardson was not disabled, the Court will have to review those opinions.

First, in March of 2003, Dr. Gallagher stated that Richardson could return to driving. There were no other statements about other restrictions applicable to Plaintiff at that time. However, on June 9, 2003, Dr. Gallagher submitted an Attending Physician Statement. In this Statement, Dr. Gallagher states that Richardson is "unable to work at 100%". Under section 8 of the Statement, entitled "Return to Work Plan", Dr. Gallagher states that the work duties Richardson can perform are: ⌀. Dr. Gallagher left blank the remainder of the questions in the return to work plan section. Prudential concludes that Dr. Gallagher's notation of ⌀ represents that the question is "not applicable", even though in response to another question in the Statement, Dr. Gallagher responded "N/A". Prudential's conclusion seems farfetched. Although Dr. Gallagher's Statement does not explicitly state that Richardson is totally and permanently disabled, a reasonable review of his Statement shows that Dr. Gallagher was of the opinion that there were no work duties that Richardson could perform and that the only change in Richardson's condition would be medical management of it. Thus, it does not appear that Dr. Gallagher's opinion supports the denial of Plaintiff's benefits.

Prudential also relies on Dr. Bachman's opinion to deny Richardson's benefits. However, after reviewing Dr. Bachman's SOAP Notes, it is clear that her conclusion is premised on, at least partially, the inclusion of Ronald S. Richardson's medical records. As stated above, Dr. Bachman's report states that Plaintiff could have returned to work "in a sedentary job during that time confirmed by the fact that on 6/3 he was 'putting up hay' when he fractured his ankle." (AR 17). Dr. Bachman's conclusions were based on fact that Richardson was well enough to be working with hay, thus, he was well enough to return to a sedentary job. Since it was not Plaintiff who fractured his ankle while "putting up hay", her opinion should be disregarded.

10

After excluding Dr. Bachman's opinion, the record includes opinions of Dr. Brackett and Dr. Gallagher, who both concluded that Richardson could not perform any work duties. The VA Hospital records do not indicate a substantial change in Richardson's condition. Prudential places great weight on the fact that after Richardson began taking Midodrine, his symptoms significantly improved. Even after Plaintiff began taking Midodrine, he suffered a syncope episode in January 23, 2004. The only mention of Midodrine being effective in Richardson's medical records is in a VA Hospital Record, dated February 24, 2004, which states, "[M]idrodine seems to have helped since initiation." (AR 101). Even if Midrodine helped Richardson somewhat, there is evidence that he continued to experience symptoms of his condition on an on-going basis. During a visit to the VA Hospital on December 5, 2003, the records show:

> [Richardson] was also started on Midodrine. States continues to have spells- when fatigued / following activity when feels lightheaded / like is going to pass out. States starts with pain in chest which goes to neck, has trouble breathing, then gets fuzzy headed and feels faint but does not go completely out (aware of surroundings). States these episodes vary in frequency from 0 –> 3 / day. States on average has 3-4 / week. Relieved with rest.

(AR 84). Although Richardson did not have any episodes of completely losing consciousness between July 2003 and January 2004, there is evidence that he continued to suffer symptoms during that time period.

In conclusion, first, the Court will disregard Dr. Bachman's opinion because it is based on, at least partially, medical records of a third-person. The ultimate conclusion drawn by Dr. Bachman stated that Plaintiff could return to a sedentary job confirmed by the fact that he had been working "putting up hay", although the information about "putting up hay" was in the medical records of a third-person. Second, Prudential relies on Dr. Gallagher's opinion that

11

Richardson could resume driving for evidence that he could return to work. After making that recommendation, however, Dr. Gallagher submitted an Attending Physician Statement concluding that the work duties Richardson could perform were ø. Prudential's explanation that the symbol ø should be read to mean "not applicable" and not zero or "null set" is implausible. The remainder of the medical records show that Richardson had episodes of complete loss of consciousness in November 2002, May 2003 and July 2003. In January 2004, Richardson had an episode where he did not fully lose consciousness, but did have indigestion, nausea, lightheadedness and loss of both bowel and bladder control. During this time period, the record shows that Plaintiff continued to have presyncope episodes with indigestion, nausea and lightheadedness that occurred on average of three to four times per week. (AR 84). Both Dr. Gallagher and Dr. Brackett concluded that this condition prohibited Richardson from working. Since there does not appear to be a significant change in Richardson's condition, Prudential's denial of his benefits is not rational.

The evidence supports the conclusion that Richardson suffers from a condition which prohibits him from performing work duties, thus, Prudential will have to find more than a mere possibility that Richardson can return to work. "The mere possibility that a participant in an ERISA plan might be able to return to some type of gainful employment, in light of overwhelming evidence to the contrary, is an insufficient basis upon which to support a plan administrator's decision to deny that participant's claim for LTD benefits." *See McDonald v. Western-Souther Life Ins. Co.,* 347 F.3d 161, 169 (6th Cir. 2003); *Mein v. Pool Co. Disabled Int'l Employee Long Term Disability Benefit Plan,* 989 F.Supp. 1337, 1350 (D.Colo.1998)(holding that a plan administrator's decision to deny ERISA benefits was arbitrary and capricious where it was based

12

upon a physician's opinion that the claimant may be capable of some sedentary work). Since the only physician who concluded that Richardson would be capable of some sedentary work was Dr. Bachman and her conclusion was partially based on the medical records of a third-party, the Court finds that Prudential's decision to deny benefits was arbitrary and capricious.

### III. CONCLUSION

For the foregoing reasons, the Court, being otherwise fully and sufficiently advised, HEREBY ORDERS that:

[1] the Plaintiff's motion for judgment [DE #10] is GRANTED;

[2] judgment will be entered in favor of the Plaintiff contemporaneously with this opinion and order.

This 26th day of September, 2005.

_____
KARL S. FORESTER, SENIOR JUDGE